IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LEE MARTIN, | ) | Case No. 1:25-cv-01397-RJS |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| v. | ) | |
| | ) | |
| COMMISSIONER OF | ) | **MEMORANDUM OPINION AND** |
| SOCIAL SECURITY, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

## I.     Introduction

Plaintiff Lee Martin, ("Martin") seeks judicial review of the final decision of the

Commissioner of Social Security, denying his applications for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security

Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule

72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and

reached a decision supported by substantial evidence, I recommend that the Commissioner's

final decision denying Martin's applications for DIB and SSI be remanded.

## II.     Procedural History

Martin filed for DIB and SSI on September 19, 2022, with a disability onset date of July

2, 2022, later amended to January 1, 2023. (Tr. 59). The claims were denied initially and on

reconsideration. (Tr. 222-26, 227-31, 233-36, 237-40). He then requested a hearing before an

ALJ. (Tr. 234). Martin (represented by counsel) and a vocational expert ("VE") testified before

the ALJ on May 8, 2024. (Tr. 134-165). On June 24, 2024, the ALJ issued a written decision finding Martin not disabled. (Tr. 56-71). The Appeals Council denied his request for review on May 7, 2025, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. §§ 404.955, 404.981). Martin timely filed this action on October 27, 2025. (ECF Doc. 1).

### III.  Evidence

#### A.  Personal, Educational, and Vocational Evidence

Martin was 47 years old on the alleged onset date, making him a younger individual according to Agency regulations. (*See* Tr. 70). He graduated from high school. (*See id.*). In the past, he worked as a childcare attendant, DOT 359.677-010, SVP 3, medium as generally performed, light as actually performed, and teacher, DOT 091.227.010, SVP 7, light as generally and actually performed. (*Id.*).

#### B.  Relevant Medical Evidence

##### 1.  Physical Impairments

On February 21, 2023, an x-ray revealed mild to moderate degenerative changes of Martin's lumbar spine. (Tr. 612).

On June 15, 2023, a colonoscopy revealed large internal and external inflamed hemorrhoids causing rectal bleeding; two small polyps; and a tortuous colon. (Tr. 632-33). Martin followed up with the Department of Gastroenterology and Hepatology on July 25, 2023. (Tr. 748). Martin reported worsening left lower quadrant abdominal pain since his colonoscopy in June 2023 which prevented him from walking and working. (*Id.*). Dr. Stanley Cohen, M.D., found tenderness to palpation in the left flank, groin, and mid-axillary line without evidence of a hernia or overlying skin changes. (Tr. 749). Dr. Cohen assessed Martin's abdominal pain as

related to musculoskeletal etiology and less likely related to gastrointestinal pathology. (Tr. 750). Dr. Cohen advised Martin to continue Metamucil daily with water; re-start Bentyl; and referred Martin to the Pain and Healing Center for follow-up of left lower quadrant and left flank pain. (Tr. 751).

Martin presented to Kristen Ruckstuhl, D.O., with a chief complaint of pain in his right middle abdomen on August 9, 2023. (Tr. 916). Martin's physical examination was unremarkable. (Tr. 918-19). Dr. Ruckstuhl prescribed Vitamin B-12 and Vitamin D and referred Martin to physical therapy. (Tr. 921). Dr. Ruckstuhl recommended follow-up in six months. (Tr. 922).

On August 23, 2023, Martin presented to pain specialist Hesham Elsharkawy, M.D., and reported left sided abdominal pain for the past year that worsened with movement and activity. (Tr. 912). Dr. Elsharkawy concluded Martin's pain was likely caused by musculoskeletal secondary anterior cutaneous nerve entrapment syndrome. (Tr. 914). Martin received a left anterior cutaneous nerve block at T7-T10. (Tr. 915). On September 27, 2023, Martin received another injection for his left subcostal transversus abdominus plane and left external oblique intercostal block plane. (Tr. 911). On October 11, 2023, Martin reported that the injections brought his pain down to a one on a ten-point scale. (Tr. 909). Britani Hayes, APRN-CNP, recommended that Martin continue receiving injections as needed for pain relief and participate in physical therapy focused on core strengthening. (Tr. 911).

### 2. Mental Impairments

On July 25, 2023, Martin presented at MetroHealth Medical Center under duress after a severe mental health episode. (Tr. 674). Upon arrival, Martin presented internally stimulated with homicidal and suicidal intentions. (*Id.*). Martin appeared medically stable. (Tr. 677). The hospital gave Martin Zyprexa in an effort to pacify him. (*Id.*). Martin grew "loud and

3

aggressive," preventing a timely interview of his symptoms. (Tr. 678). After Martin pacified, he described auditory hallucinations such as thoughts of harming others. (Tr. 678-79). Martin remarked that he had been prescribed Seroquel but had not been taking it because it was a "hassle." (Tr. 679, 740). Martin reported multiple stressors in his life including that someone stole his car, another robbed him in the last month, and the day before he was brought into the hospital, people in his neighborhood shot at him. (Tr. 679, 695). Martin reported that he can handle stressors but grows angry "when things build up and things don't go his way." (*Id.*).

Martin once again grew agitated, menacing, and violent during subsequent assessments. (Tr. 685). Martin was admitted to the hospital on July 26, 2023, and diagnosed with schizoaffective disorder, bipolar type; THC use disorder; and stimulant use disorder (cocaine). (*Id.*; Tr. 714). Martin was treated with Haldol, Benadryl, and Ativan, and was discharged on July 28, 2023, after improvement in his mood. (Tr. 705, 714). At discharge, Martin was prescribed injectable Haldol, to be administered monthly, in addition to daily oral Haldol. (Tr. 714). He requested follow-up treatment with Signature Health for ongoing psychiatric care. (*Id.*).

Martin participated in intensive outpatient individual counseling sessions, group therapy, and case management services with Signature Health on a weekly basis from August 2023 through January 2024. (Tr. 817-42, 851-83, 891-97, 975-1038). On August 10, 2023, Martin presented to Emily Mikhail, APN for urgent medication management. (Tr. 825). Martin reported hallucinations, anxiety, suicidal and homicidal ideations, hypervigilance, sleep disturbance, and increased depression. (Tr. 826-27). APN Mikhail diagnosed schizoaffective disorder, bipolar type, anxiety, and cannabis abuse. (Tr. 830). APN Mikhail transferred Martin to a permanent psychiatric practitioner for complete medication safety information on current prescribed

4

medications. (Tr. 832). Martin's treatment plan included daily oral Haldol, monthly Haldol injections, hydroxyzine for anxiety, individual counseling, and group therapy. (Tr. 832-33).

On September 28, 2023, Martin established care with Kelsey Rhoades, APN. (Tr. 865). Martin reported that his mental health symptoms were controlled but still expressed mild restlessness which he attributed to the Haldol injections and boredom. (*Id.*). Martin also reported that he was no longer taking oral Haldol because the injections controlled his symptoms. (*Id.*). APN Rhoades found that Martin's schizoaffective disorder, bipolar type, persisted. (Tr. 868). APN Rhoades prescribed Haldol injections 100 mg every 28 days. (*Id.*). APN Rhoades recommended follow up in three months. (*Id.*).

From September 2023 through January 2024, Martin continued to express his desire to overcome his anxiety and explore the community. (Tr. 854-55, 857, 859, 862). Martin joined Magnolia Clubhouse - a community program for individuals with mental health conditions that provides opportunities for social interaction and skill-building - and volunteered to drop food off to the elderly. (Tr. 855, 859, 975). Matthew Neal, LPC, reported that Martin demonstrated decreased symptoms of anxiety/depression as evidenced by Martin's self-report. (Tr. 859).

On January 15, 2024, Martin followed up with APN Rhoades and reported that his mood "seems to be good, pretty even" and volunteered at the food bank on Thursdays. (Tr. 1035). Martin noted that he only gets two to three hours of sleep but denied nightmares. (*Id.*). APN Rhoades noted that Martin was not currently on any medications. (Tr. 1039). Martin declined any medication, including Haldol injections, for his schizoaffective disorder because his symptoms had improved, but APN Rhoades informed Martin that his refusal to take his medications may result in relapse and hospitalization. (*Id.*). APN Rhoades prescribed trazodone for sleep assistance. (*Id.*).

On March 15, 2024, Martin followed up with APN Rhoades for psychiatric medication management. (Tr. 977). Martin reported crying spells due to his depression but denied homicidal or suicidal thoughts. (Tr. 978). Martin described his anxiety as "no more than normal" and stated that trazodone has helped improve his sleep. (*Id.*). Martin reported no depression and increased social activity, such as visiting his son and volunteering at the food bank. (Tr. 978, 981). APN Rhoades assessed Martin with schizoaffective disorder and reported that he continued to refuse medication for his schizoaffective disorder and depression. (Tr. 981). With Martin's consent, APN Rhoades prescribed oral Abilify 5 mg to help control Martin's schizoaffective disorder. (*Id.*).

On May 7, 2024, Martin presented to APN Rhoades and stated he "still feel[s] depressed most days of the week." (Tr. 100). Martin explained that he did not want to continue group therapy because the last time he participated he was the only person there. (*Id.*). Martin also stated that trazodone was still helping his sleep. (*Id.*). APN Rhoades offered to resume Haldol injections, but Martin declined. (*Id.*). With Martin's consent, APN Rhoades increased oral Abilfiy to 10 mg for Martin's schizoaffective disorder. (*Id.*).

### C.    Medical Opinion Evidence

On April 16, 2024, Martin presented to the Department of Physical Medicine and Rehabilitation for a functional capacity assessment with Antwon Morton, D.O. (Tr. 1046). Dr. Morton completed a "Medical Source Statement: Patient's Physical Capacity" ("MSS") (*Id.*).[1] Dr. Morton opined that Martin can lift and carry up to ten pounds at the waist level occasionally; stand or walk for four hours a day; sit for eight hours a day; should avoid repetitive stooping or bending; and should avoid lifting from the floor, squatting, and crawling. (1046-47). Dr. Morton

---

[1] The ALJ only reviewed the MSS. The Functional Capacity Assessment that usually accompanies the MSS was not submitted to the ALJ.

noted that Martin had been prescribed a cane. (Tr. 1047). Dr. Morton noted that Martin has severe lumbar degenerative joint disease at L4-L5 and L5-S1, as well as left abdominal wall pain, supported by supported by a "lumbar x-ray and abdominal CT." (Tr. 1046).

On June 29, 2023, Tom Ference, Ph.D., assessed Martin's mental status. (Tr. 614). Martin reported difficulties with depressive symptoms including loss of pleasure in activities, low motivation, periods of insomnia, social withdrawal, feelings of hopelessness, fatigue, intrusive thoughts, heart palpitations, and chest tightness. (Tr. 616). Martin described difficulty completing household chores due to problems with physical functioning and motivation, but described little difficulty grooming, grocery shopping, and managing his medications. (*Id.*). Dr. Ference diagnosed Martin with unspecified depressive disorder, unspecified anxiety disorder, and unspecified trauma- and stressor-related disorder. (Tr. 618). Dr. Ference then completed a functional assessment. (*Id.*). Dr. Ference opined that the Martin has some limitations with remembering instructions; may have limitations with interpersonal interaction in work settings; and may have limitations with mood stability in a competitive work setting. (Tr. 618-19).

On March 28, 2024, APN Rhoades completed a "Medical Source Statement" on Martin's mental capacity based on her six-month treatment relationship with him. (Tr. 964, 1043). APN Rhoades opined that Martin could understand, remember, and apply information independently, appropriately, effectively, and on a sustained basis. (*Id.*). APN Rhoades noted that Martin was markedly limited in his ability to understand and respond to social cues (physical, verbal, emotional) and respond to requests, suggestions, criticism, correction, and challenges, but only moderately limited in his ability to handle conflict with others and state his own point of view. (*Id.*). She also found that Martin was moderately limited in his ability to respond to demands, adapt to changes, and manage his physiologically based symptoms. (Tr. 965, 1044). APN

Rhoades diagnosed Martin with schizoaffective disorder, bipolar type, noting that his condition results in significant difficulty interpreting social cues, maintaining interpersonal relationships, and a history of aggressive or violent behavior during periods of decompensation. (*Id.*).

In June 2023, at the initial level, State agency mental health reviewer Evelyn Adamo, Ph.D., opined that, based on the available evidence, Martin's mental impairments "cause no more than minimal functional limitations." (Tr. 177, 187). On reconsideration in August 2023, State agency mental health reviewer Audrey Todd, Ph.D., stated that medical evidence established psychological medically determinable impairments, but there was insufficient evidence to evaluate the claimant's mental limitations. (Tr. 199, 207).

In July 2023, at the initial level, State agency medical reviewer Gary Hinzman, M.D., opined that Martin could perform work at the light exertional level; could never climb ladders/ropes/scaffolds, could occasionally climb ramps/stairs, and could frequently stoop, kneel, crouch, and crawl; and must avoid all exposure to hazards such as heights and commercial driving. (Tr. 178-80, 188-90). In August 2023, State agency medical consultant Leon Hughes, M.D., affirmed Dr. Hinzman's opinion. (Tr. 200-202, 208-10).

### D. New Medical Evidence

On April 16, 2024, Martin presented to the Department of Physical Medicine and Rehabilitation for a functional capacity assessment with Dr. Morton. (Tr. 1046-47). Dr. Morton completed an MSS (Tr. 1046) and a "Functional Capacity Assessment" ("FCA") (Tr. 19). The ALJ received the MSS but not the FCA. (Tr. 1-3).

Martin's chief complaint was his left abdominal pain and lower back pain. (Tr. 19). Martin presented pleasant, well-nourished, well-developed, and in no acute distress. (Tr. 23). Based on the history and physical exam, Dr. Morton opined that Martin has mild to moderate

8

functional limitations. (*Id.*). Dr. Morton omitted his previous assessment that Martin had been prescribed a cane. (*See* Tr. 19-23, 1047). Dr. Morton noted that Martin can lift and carry up to ten pounds at the waist level occasionally; should avoid repetitive stooping or bending; and should avoid lifting from the floor, squatting, and crawling. (Tr. 23). Martin exhibited full strength in all upper and lower extremities, normal coordination, and a normal gait. (*Id.*). Dr. Morton diagnosed Martin with moderate to severe lumbar degenerative joint disease at L4-L5 and L5-S1, as well as left abdominal wall pain. (*Id.*). Dr. Morton concluded that Martin could work at a sedentary level. (*Id.*).

### E.    Administrative Hearing Evidence

The administrative hearing occurred on May 8, 2024. (Tr. 132). At the time of the hearing, Martin lived alone and had not worked since the end of 2022. (Tr. 148). Martin testified that he worked as a childcare worker, an afterschool site coordinator, and a teacher. (Tr. 149-50, 153-54). Martin stated that he lost past jobs due to travel inconveniences and tardiness. (Tr. 151, 153).

Martin stated his left side abdominal pain prohibits him from moving, walking, bending, and sitting for long periods of time. (Tr. 140). Martin stated his pain is constant, averaging a six on a ten-point scale, and occurs daily. (Tr. 141-42). Martin estimated that he could walk or stand for approximately 30 minutes at a time before needing to rest. (Tr. 142). Martin found relief from his pain only when lying down and later stated he lies down approximately six hours a day. (Tr. 141-42). Martin explained that he cannot clean, cook, and complete certain tasks, such as chores, without the assistance of his mom or dad. (Tr. 142-43). Martin stated he could drive if required. (Tr. 143-44).

On the mental component, Martin explained his memory deficiencies, requiring his mom to remind him of certain tasks and responsibilities. (Tr. 143, 145). Martin expressed fear of leaving the home. (Tr. 141). Martin attended the Magnolia Clubhouse, a social program designed for individuals with psychological needs, up to three days per week. (Tr. 144). Martin explained that the Magnolia Clubhouse helps with his feelings of isolation. (*Id.*). He further stated he could not tolerate sitting in the group sessions for more than about 20 minutes at a time due to pain and trouble concentrating. (Tr. 146-47). Martin explained that his sleep has improved with his new medication. (Tr. 145).

The ALJ then questioned Martin. (Tr. 148). Martin reiterated his career history as a teacher and childcare worker. (Tr. 148-55). The ALJ then asked if Martin recognized the name "Dr. Morton." (Tr. 157). Martin did not initially remember Dr. Morton but described him as his "most recent doctor." (*Id.*). Martin explained that his current medications, prescribed by APN Rhoades, include trazodone for depression and anxiety and Abilify for schizophrenia. (Tr. 156). Martin is currently on Medicaid. (Tr. 157).

Next, the VE testified. (Tr. 159). According to the VE, Martin's past work included childcare monitor and afterschool program coordinator, collectively, DOT 359.677-010, CVP 3, medium per the DOT, light as actually performed, and teacher, DOT 091.227-010, SVP 7, light per the DOT and as performed. (Tr. 160).

The ALJ posed a hypothetical person with the same past job experience as Martin; limited to working light exertion jobs; required to use ramps and stairs but never use ladders, ropes, or scaffolds; limited to frequently kneeling, stooping, crouching, and crawling; restricted from hazards, such as heights and machinery, but would be able to avoid ordinary hazards in a

workplace, such as boxes on a floor, doors ajar, or approaching people or vehicles; and never required to operate a motor vehicle during the course of a workday. (*Id.*).

According to the VE, the job of childcare attendant would remain as actually performed and the job of teacher would remain both as actually and generally performed. (Tr. 161). The VE testified that for the limitation regarding the differentiation in climbing and driving, she relied on her education and experience as a VE because those limitations are not specifically addressed in the DOT or the SCO. (*Id.*).

If the first hypothetical person were still limited to light work but further restricted from understanding and responding to social cues, and would be restricted from responding to requests, suggestions, criticism, correction, and challenges, that person could no longer perform Martin's past work or any work in the national economy. (Tr. 161-63). The VE based her determination on her education and experience because the additional restrictions are not included in the DOT or the SCO. (Tr. 162).

If the first hypothetical person were still limited to light work but also limited to simple, routine, or repetitive tasks, that person could no longer perform Martin's past work, but could perform the light, unskilled jobs of marker, DOT 209.587-034, light, SVP 2 with approximately 63,000 jobs in the national economy; inspector and hand packager, DOT 559.687-074, light, SVP 2 with approximately 50,000 jobs in the national economy; and routing clerk, DOT 222.687-022, light, SVP 2 with approximately 57,000 jobs in the national economy. (Tr. 163). The VE affirmed that her testimony was consistent with the DOT and SCO, but the limitations regarding the differentiation in climbing, driving, and social interactions were based on the VE's education and experience. (Tr. 163-64).

11

If any of the previous hypothetical persons were still limited to light work but require frequent breaks throughout the day due to ongoing and underlying pain, the need to get away from co-workers, and be off task 20 percent of any given workday, that person could no longer perform Martin's past work or any work in the national economy because being off-task 20 percent of any given workday precludes all work. (Tr. 164).

If any of the previous hypothetical persons were still limited to light work but require work breaks that are unscheduled and amount to four hours or more each workday, that person could no longer perform Martin's past work or any work in the national economy. (Tr. 164-65).

## IV.     The ALJ's Decision

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2026.

2.      The claimant has not engaged in substantial gainful activity since January 1, 2023, the amended alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.      The claimant has the following severe impairments: schizoaffective disorder, bipolar type; degenerative spine disorder; diverticulitis; and depression (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). In addition, the claimant can never climb ladders/ropes/scaffolds and can occasionally climb ramps/stairs. The claimant can frequently kneel, stoop, crouch, and crawl. The claimant can have no exposure to hazards such as heights or machinery but is able to avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar, or approaching people or vehicles. The claimant can perform simple, routine, and repetitive tasks.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on February 14, 1975 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2023, the amended alleged onset date, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 61-71).

## V.      Law & Analysis

### A.      Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.      whether the claimant is engaged in substantial gainful activity;

2.      if not, whether the claimant has a severe impairment or combination of impairments;

3.      if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.      if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.      if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

13

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.      Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is "'more than a scintilla of evidence but less than a preponderance.'" *Napier v. Comm'r of Soc. Sec.*, 127 F.4th 1000, 1004 (6th Cir. 2025) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)). It means "'relevant evidence . . . a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Biestek v. Berryhill*, 587 U.S. 97, 103, (2019)). Even when an ALJ's decision is supported by substantial evidence, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision

14

. . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Maximovich v. Comm'r of Soc. Sec.*, No. 1:24-CV-01448, 2025 WL 837817, at *6 (N.D. Ohio Mar. 18, 2025) (quoting *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

## VI.    Discussion

Martin raises two issues for this Court's review, arguing that:

1.    The ALJ's evaluation of treating mental health provider Kelly Rhoades, APN, PMHNP-BC's opinion is not supported by substantial evidence.

2.    The functional capacity evaluation of Dr. Antwon Morton, DO is new and material evidence that corroborates and strengthens Dr. Morton's medical opinion.

(ECF Doc. 10-1, p. 1).

### A.    A Sentence Six remand is appropriate here.

Martin contends that "the new evidence—Dr. Antwon Morton's examination and RFC assessment—squarely meets [sentence six of 42 U.S.C. § 405(g)] standards." (ECF Doc. 10-1, p.

15

18). Conversely, the Commissioner argues that Martin does not meet the sentence six criteria. (ECF Doc. 11, p. 11).

After the Appeals Council considers new evidence but declines the request for review, a court may remand a case for the Commissioner to consider newly discovered evidence pursuant to sentence six of 42 U.S.C. § 405(g). To obtain such a remand, the claimant must show that: (1) the evidence is new; (2) the evidence is material; and (3) good cause excuses the claimant's failure to incorporate the evidence into a prior administrative proceeding. 42 U.S.C. § 405(g); *Casey v. Sec'y of Health & Hum. Serv.*, 987 F.2d 1230, 1233 (6th Cir. 1993). "New evidence" is evidence that did not exist or was not available to the claimant at the time of the administrative proceeding. *Finkelstein v. Sullivan*, 496 U.S. 617, 626 (1990). To be material, the evidence must be: (1) chronologically relevant, i.e. reflect upon the claimant's condition during the relevant period; and (2) probative, i.e., have a reasonable probability that it would change the administrative result. *See Casey*, 987 F.2d at 1233 (holding that a claimant's new evidence was not material because it did not show a "marked departure from previous examinations" and it "pertain[ed] to a time outside the scope of our inquiry"); *accord Winslow v. Comm'r of Soc. Sec.*, 556 F. App'x 418, 422 (6th Cir. 2014). The Sixth Circuit takes a "harder line" approach to good cause – a claimant cannot simply point to the fact that the evidence was not created until after the ALJ hearing but must establish good cause for why he did not cause the evidence to be created and produced until after the administrative proceeding. *See Perkins v. Apfel*, 14 F. App'x 593, 598-99 (6th Cir. 2001).

The record at issue is Dr. Morton's FCA completed on April 16, 2024. (Tr. 19-24). Dr. Moton used the FCA – a document the ALJ did consider in its decision – to complete the MSS. (Tr. 1046-47).

Dr. Morton's FCA meets the sentence six of 42 U.S.C. § 405(g) elements. First, the FCA is new because it was not available to Martin at the time of the administrative proceeding. (Tr. 69). Second, Martin establishes good cause for why he did not cause the evidentiary delay and production until after the administrative proceeding. Although both the MSS and FCA were completed on April 16, 2024, counsel's access depended on the hospital, and the hospital did not send the FCA form until after the hearing. (ECF Doc. 10-1, p. 18). Thus, good cause exists because the delay was created by the hospital, not Martin.

Last, the FCA is materially relevant. The FCA is chronologically relevant because it includes medical documentation completed before the ALJ's decision and within the relevant onset period. (Tr. 19-23). Also, the FCA is probative to the ALJ's concerns. The ALJ states, "Dr. Morton offers limited support for the alleged degree of limitations other than noting the claimant's abdominal and back pain. In addition, the medical evidence of record does not appear to include treatment records from Dr. Morton." The FCA represents the additional evidence and treatment records that the ALJ demands. The FCA adds direct support to the MSS's conclusions that Martin can lift and carry up to ten pounds at the waist level occasionally; should avoid repetitive stooping or bending; and should avoid lifting from the floor, squatting, and crawling. (Tr. 23, 1046-47). The FCA also confirms the MSS's diagnosis of severe lumbar degenerative joint disease at L4-L5 and L5-S1, as well as left abdominal wall pain. (Tr. 23). The FCA supports Dr. Morton's MSS findings and directly addresses the ALJ's concern for additional objective evidence. (Tr. 69). The FCA adds to the supportability element, providing an in-depth explanation to Dr. Morton's findings in the MSS. With the supportability element strengthened to the ALJ's specifications, the ALJ must now re-weigh Dr. Morton's medical opinion.

Thus, the FCA is new, material, and good cause excuses Martin's failure to incorporate the evidence into a prior administrative proceeding. The FCA was completed prior to the ALJ decision and answers the ALJ's concerns about supportability. For these reasons, this Court remands Martin's case for further consideration of Dr. Morton's FCA.

**B.**      **The ALJ did not properly evaluate the opinions of the treating and examining sources.**

Martin argues that the ALJ's analysis of APN Rhoades' opinions failed to satisfy requirements of 20 C.F.R. § 404.1520c because his decision was "legally insufficient and unsupported by the record." (*Id.* at p. 15). Martin disputes the ALJ's claim that APN Rhoades' opinion concerning social interaction limitations did not fully consider evidence of Martin's mood stabilization and his ability to interact in public spaces. (*Id.*). Rather, as Martin contends, the basis of APN Rhoades' opinion was grounded in a comprehensive and well-documented treatment history and supported by the broader treatment record. (*Id.* at pp. 16-17). Martin adds that the ALJ's emphasis on the "short-term" nature of APN Rhoades' treating relationship and reliance on Martin's occasional ability to shop or visit a library as evidence of intact social functioning is misplaced. (*Id.*).

The Commissioner responds that there is substantial evidence that APN Rhoades' opinion was inconsistent and unsupported by the record. (ECF Doc. 11, p. 11). In the Commissioner's view, the ALJ did not equate Martin's mood stabilization and his ability to interact in public spaces to his ability to sustain full-time work but rather noted them to exemplify APN Rhoades's inconsistency with the record. (*Id.* at p. 10). The Commissioner also notes that the ALJ's emphasis on the "short term" nature of Ms. Rhoades' treating relationship was not required under 20 C.F.R. § 404.1520c(b)(2) and is therefore irrelevant. (*Id.* at p. 9).

The evaluation of medical opinion evidence is governed by 20 C.F.R. § 404.1520c. This regulation mandates that the ALJ "will not defer or give any evidentiary weight, including controlling weight to any medical opinion(s)." 20 C.F.R. § 404.1520c(a). Rather, the ALJ must evaluate each medical opinion's persuasiveness based on its: (1) supportability; (2) consistency; (3) relationship with the plaintiff; (4) specialization; and, (5) "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(c); *see also Heather B. v. Comm'r of Soc. Sec.,* No. 3:20-cv-442, 2022 WL 3445856 (S.D. Ohio Aug. 17, 2022).

Supportability and consistency are the most important factors; ALJs must "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative findings in [their] determination or decision." 20 C.F.R. § 404.1520c(b)(2). ALJs "may, but are not required to," consider factors three through five when evaluating medical source opinions. (*Id.*).

For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). For consistency, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and non-medical sources in the claim, the more persuasive the medical opinion(s)." 20 C.F.R. § 404.1520c(c)(2).

An ALJ must "provide a coherent explanation of his [or her] reasoning." *Lester v. Saul*, No. 5:20-cv-01364, 20 WL 8093313 at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom.*, *Lester v. Comm'r of Soc. Sec.*, No. 5:20-cv-01364. 2021 WL 119287 (N.D. Ohio, Jan. 13, 2021). The ALJ's medical source opinion evaluation must contain a

19

"minimum level of articulation" to "provide sufficient rationale for a reviewing adjudicator or court." *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844, 5858 (Jan. 18, 2017). If an ALJ does not "meet these minimum levels of articulation," it "frustrates this [C]ourt's ability to determine whether her disability determination was supported by substantial evidence." *Heather B.*, 2022 WL 3445856 at *3.

In assessing APN Rhoades' medical opinion, the ALJ determined it partially persuasive and partially unpersuasive, writing that APN Rhoades:

> opined that the claimant has no limitations in understanding, remembering, or applying information; mild to marked limitations in interacting with others; no to mild limitations in concentrating, persisting, or maintaining pace; and no to moderate limitations in adapting or managing oneself (Exhibit 11F; 13F). The undersigned does not find this opinion fully persuasive. The undersigned does not find the opinion concerning the claimant's social limitations persuasive, and finds the other mental limitations persuasive. While Ms. Rhoades noted the claimant's history of schizoaffective disorder which may cause interpersonal problems and his aggressive behavior during a hospitalization, Ms. Rhoades does not appear to fully consider evidence that the claimant's mood has been stabilized with medication and that the claimant is able interact appropriately in public spaces such as the library and grocery stores. Ms. Rhoades only has a short-term treating relationship with the claimant, and the claimant did not start seeing Ms. Rhoades until after he applied for benefits (See Exhibit 7F/18). The opinion is not consistent with recent mental health treatment records indicating decreased symptoms of anxiety and depression, the claimant's ability to use rideshares and help take care of his son, and limited evidence of ongoing aggressive behavior after his hospitalization (Exhibit 12F/10, 32).

(Tr. 69).

In regard to consistency, the ALJ wrote that her opinions were "not consistent with recent mental health treatment records" that indicated "decreased symptoms of anxiety and depression, the claimant's ability to use rideshares and help take care of his son, and limited evidence of ongoing aggressive behavior after his hospitalization." (*Id.*). The record supports the ALJ's conclusion. For five to six months leading up to his visit with APN Rhoades in March 2024, Martin continued to express improvement and desire

to overcome his anxiety and explore the community, (Tr. 854-55, 857, 859, 862); joined Magnolia Clubhouse; and volunteered to drop food off to the elderly. (Tr. 855, 975, 1035). In addition, LPC Neal reported that Martin demonstrated decreased symptoms of anxiety/depression as evidenced by Martin's self-report. (Tr. 859). The ALJ's analysis of the consistency of APN Rhoades' opinions with the medical record provides a coherent explanation for subsequent reviewers to discern how the ALJ arrived at his conclusions, exceeding the minimum level of articulation required. *Heather B.*, 2022 WL 3445856, at *3. As the ALJ cites substantial evidence in support of his evaluation of the consistency of APN Rhoades' opinions, it survives review here.

But the ALJ's analysis falls short regarding supportability of the opinions. The ALJ writes that APN Rhoades "does not appear to fully consider evidence that the claimant's mood has been stabilized with medication and that the claimant is able to interact appropriately in public spaces such as the library and grocery stores." (Tr. 69). The ALJ continues, "[APN] Rhoades only has a short-term treating relationship with the claimant, and the claimant did not start seeing [APN] Rhoades until after he applied for benefits." (*Id.*).

The ALJ's assertions are inaccurate and unsupported. Martin established a treatment relationship with APN Rhoades on recommendation after his July 25 through July 28, 2023 hospitalization and acute outpatient care. (Tr. 832, 865). Martin maintained an established treatment relationship with APN Rhoades from September 2023 through May 2024, visiting her every three months as she recommended. (Tr. 100, 865, 977, 1035). Throughout the treatment relationship, APN Rhoades noted and treated Martin's depression, schizoaffective disorder, and his restless sleep. (*Id.*). Martin continuously

21

refused Haldol injections after his first visit with APN Rhoades to manage his schizoaffective disorder but agreed to Abilify and trazodone. (Tr. 100, 981, 1039). Based on her three treatment visits with Martin, APN Rhoades completed a functional capacity assessment on March 28, 2024, and opined Martin's limitation to properly interact with others and noted her findings of schizoaffective disorder. (Tr. 1044-45). Following APN Rhoades' completing of the functional capacity assessment, Martin continued to treat with her. (Tr. 100).

The Commissioner's arguments in response are not well taken. The Commissioner argues that the ALJ's assessment of APN Rhoades' "short term" treating relationship with Martin was not required under 20 C.F.R. § 404.1520c(b)(2). (ECF Doc. 11, p. 9). The ALJ, however, improperly described Martin's treating relationship with APN Rhoades to discount the persuasiveness of APN Rhoades' opinion, making this point relevant. Martin established and maintained care  with APN Rhoades for six months, and APN Rhoades consistently acknowledged Martin's mood improvement with continuous findings of schizoaffective disorder. (Tr. 978, 981, 983, 1035, 1038). The ALJ fails to cite to *any* of Martin's appointments with APN Rhoades in the ALJ's assertions to build a logical bridge. (*See* Tr. 69). The one cited record from the ALJ only supports the assertion that the treating relationship began after Martin applied for benefits – an irrelevant fact to the analysis. (*Id.*).

The ALJ also states that APN Rhoades failed to fully consider Martin's ability to "interact appropriately in public spaces such as the library and grocery stores." These findings, however, were reported to Makenzie Dutton, QMHS/CMS, not APN Rhoades.

(Tr. 85, 88, 97, 106, 109, 851-53, 891-92, 895-97, 975, 986). This assertion addresses the consistency, not supportability, of APN Rhoades' medical opinion.

Although the ALJ is not required to use the "magic words" of "supportability" when describing their reasoning, the ALJ must still provide sufficient reasoning, scaffolded with references in the medical record to support their decision, enough for a subsequent reviewer to trace the lines of their reasoning. *Lawrence v. Comm'r of Soc. Sec.*, No. 1:21-CV-01691-JG, 2023 WL 2246704, at *20 (N.D. Ohio Jan. 19, 2023), *report and recommendation adopted*, No. 1:21-CV-01691, 2023 WL 2242796 (N.D. Ohio Feb. 27, 2023) ("Although the ALJ did not use the term supportability or consistency in the above evaluation, the ALJ made findings relative to the opinion related to supportability and consistency.").

Thus, there is no evidence in the record to support the ALJ's decision because the reasons given did not "build an *accurate* and logical bridge between the evidence and the result." *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996) (emphasis added). The ALJ's inaccurate characterization of APN Rhoades' medical opinion and treatment relationship with Martin fails to meet the minimum level of articulation and does not provide a sufficient rationale. For these reasons, this Court remands Martin's case for further consideration of APN Rhoades' opinion regarding Martin's mental health limitations.

## VII.    Conclusion

Because Dr. Morton's FCA satisfies the sentence six requirements and the ALJ failed to come to a decision supported by substantial evidence, this Court vacates the Commissioner's final decision denying Martin applications for DIB and SSI and remands Martin's case for further consideration.

Dated: March 18, 2026

Reuben J. Sheperd
United States Magistrate Judge